```
              IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CAITLIN RUSSO,                  )
                                )
          Plaintiff,            )
                                )
     v.                         )   Civil Action No. 09-1169
                                )
DIOCESE OF GREENSBURG and,      )
  GREENSBURG CENTRAL CATHOLIC   )
  HIGH SCHOOL,                  )
          Defendants.           )
```

MEMORANDUM

Gary L. Lancaster,
Chief Judge.                                    September 15, 2010

This is an action in civil rights. Plaintiff, Caitlin Russo, a former student at Greensburg Central Catholic High School, contends that defendants, the Diocese of Greensburg and Greensburg Central Catholic High School, discriminated and retaliated against her on the basis of her gender in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, et seq., and discriminated against her on the basis of her disability in violation of section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 791, et seq. Although defendants filed a timely motion to dismiss the complaint in November of 2009 [doc. no. 8], the parties agreed that the court should first resolve the foundational legal question of whether defendants received Federal Financial Assistance, making them amendable to suit under Title IX and the Rehabilitation Act, and vesting this court with subject matter jurisdiction over the dispute [doc. nos. 12, 15].

Russo asserts that the Diocese and GCCHS are recipients of Federal Financial Assistance because: (1) some schools within the Diocese, although not GCCHS, participate in the National School Lunch program; (2) GCCHS, and other schools within the Diocese, participate in the E-rate program; (3) GCCHS, and other schools within the Diocese, receive equitable services under the Elementary and Secondary Education Act; and (4) the Diocese, and its schools, enjoy tax exempt status under the Internal Revenue Code. The Diocese and GCCHS deny that they are recipients of Federal Financial Assistance.

The parties have engaged in discovery limited to the issue of whether the Diocese and/or GCCHS receive Federal Financial Assistance, and have fully briefed the issue in the context of the Diocese and GCCHS's motion for partial summary judgment [doc. no. 18]. We conclude that both defendants receive Federal Financial Assistance because they participate in the National School Lunch and E-rate programs.[1] As such, we enter judgment as a matter of

---

[1] It is important to note at the outset that our ruling is the result of our consideration and interpretation of relevant statutory language found in Title IX and the Rehabilitation Act. We make no ruling on, and express no opinion as to the relevancy of this ruling to, any constitutional provision, including, but not limited to, the Establishment Clause.

law in favor of Russo on this foundational legal issue.[2] It follows that this court has subject matter jurisdiction over Russo's Title IX and Rehabilitation Act claims. We will exercise supplemental jurisdiction over her state law claims.

Any issues raised in defendants' motion to dismiss [doc. no. 8] that remain viable following this ruling will be addressed in a separate opinion, which will be filed contemporaneously.

I.   BACKGROUND

Caitlin Russo was a student at Greensburg Central Catholic High School between August 2004 and September 2007. During her tenure at GCCHS, Russo experienced various interactions with one teacher, which she characterizes as sexual harassment, and suffered from numerous medical conditions, which she contends resulted in her being discriminated against on the basis of a disability. She and her parents had several meetings with various GCCHS and Diocese officials to address these problems, apparently without success. Russo alleges that the Diocese and GCCHS

---

[2] Although Russo has not moved for entry of summary judgment in her favor on the Federal Financial Assistance issue raised in the Diocese and GCCHS's motion for summary judgment, the parties have conducted all discovery and briefed the issue fully, and had previously represented to the court that this issue could, and should, be decided on summary judgment. As such, the court will enter judgment as a matter of law in Russo's favor, sua sponte. Gibson v. Mayor and Council of City of Wilmington, 355 F.3d 215, 223-24 (3d Cir. 2004).

retaliated against her for reporting the problems with her teacher to these officials.

Russo withdrew from GCCHS shortly after she began her senior year in September of 2007. Russo thereafter enrolled in her local public high school. Even though she was no longer a student at GCCHS, Russo contends that the Diocese and GCCHS continued to interfere with her education on the basis of her gender and disability during her senior year of high school. Regardless, Russo graduated from her public high school in a timely fashion, although she does allege that her "ability to attend college" was "delay[ed]" by the Diocese and GCCHS.

In August of 2009 Russo filed suit against the Diocese and GCCHS alleging that they discriminated against her on the basis of her gender and disability while she was a student at GCCHS and after she withdrew to attend her local public high school, and retaliated against her for making allegations of sexual harassment against one of her teachers [doc. no. 1]. She also asserted state law claims for breach of contract and intentional and negligent infliction of emotional distress. Id. In their original motion to dismiss, the Diocese and GCCHS argued, among other things, that Russo had failed to plead sufficient facts to support her conclusory legal allegation that they were recipients of Federal Financial Assistance [doc. no. 10 at pp. 8-10, 20-21].

Thereafter, the parties informed the court that the question of whether the Diocese and/or GCCHS received Federal Financial Assistance was fundamental to this court's jurisdiction [doc. no. 12]. Therefore, they jointly sought permission to take discovery on that sole issue, and asked that the remainder of the case be stayed pending its resolution. The court granted the parties' request to proceed in that manner [doc. no. 15].

II. <u>LEGAL AUTHORITY</u>

    A.  <u>Summary Judgment</u>

Summary judgment may be granted if, drawing all inferences in favor of the non-moving party, "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

The mere existence of some factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. A dispute over those facts that might affect the outcome of the suit under the governing substantive law, <u>i.e.</u>, the material facts, however, will preclude the entry of summary judgment. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). Similarly, summary judgment is improper so long as the dispute over the material facts is genuine. <u>Id</u>. In determining

5

whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the non-moving party. Id. at 248-49.

In summary, the inquiry on a Rule 56 motion is whether the evidence of record presents a genuine dispute over material facts so as to require submission of the matter to a jury for resolution of that factual dispute, or whether the evidence is so one-sided that the movant must prevail as a matter of law.

B.   Federal Financial Assistance and Anti-Discrimination

Congress may impose reasonable conditions on the receipt of federal funds as part of its spending power. Pennhurst State School and Hospital v. Halderman, 451 U.S. 1, 16-17 (1981). Both Title IX and the Rehabilitation Act impose the condition of non-discrimination, on the basis of sex and disability, respectively, on any program or activity receiving Federal Financial Assistance. 20 U.S.C. § 1681(a) and 29 U.S.C. § 794(a). Because of how broadly the phrase "any program or activity" is defined in these statutes, this condition applies institution-wide, rather than only to the particular program or activity that is supported by federal funds. See, Civil Rights Restoration Act of 1987, Pub.L. No. 100-259, 102 Stat. 28 (1988); 20 U.S.C. § 1687 (defining program or activity

6

broadly in the context of Title IX); 29 U.S.C. § 794(b) (defining program of activity broadly in the context of Rehabilitation Act); <u>Bowers v. Nat'l Collegiate Athletic Association</u>, 118 F.Supp.2d 494, 526-27 (D.N.J. 2000) (discussing Civil Rights Restoration Act's restoration of broad, institution-wide application of Title IX, the Rehabilitation Act, and other federal anti-discrimination laws).

III. <u>DISCUSSION</u>

The sole issue presented in this motion for partial summary judgment is whether the Diocese and/or GCCHS receive Federal Financial Assistance, thus subjecting them to the non-discrimination requirements imposed by Title IX and the Rehabilitation Act and, in turn, providing this court with subject matter jurisdiction over this controversy. We find that they do receive Federal Financial Assistance because they participate in the National School Lunch and E-rate programs.

Because we find that the Diocese and GCCHS receive Federal Financial Assistance by participating in the National School Lunch and E-rate programs, we need not rule on the remaining alleged instances of assistance, namely equitable participation under the Elementary and Secondary Education Act and tax exempt status under the Internal Revenue Code. However, we are inclined to express our doubt, without necessarily deciding, that Russo could prove that either coordinating educational services with the

public school district or obtaining tax exempt status would transform a private, parochial school into a recipient of Federal Financial Assistance for purposes of Title IX and/or the Rehabilitation Act.

### A. National School Lunch Program Participation

Geibel Catholic Middle-High School, one of two Diocesan high schools, participated in the National School Lunch program during the 2004-2005, 2005-2006, 2006-2007, and 2007-2008 school years. GCCHS, the other Diocesan high school, has never participated in the NSLP. Geibel received federal subsidies under the program ranging from $7,575.79 to $8,933.32, per year. See, e.g., doc. no. 20-3 at pp. 13 and 16. Therefore, Geibel is a recipient of Federal Financial Assistance. DeVargas v. Mason & Hanger-Silas Mason Co., Inc., 911 F.2d 1377, 1382 (10th Cir. 1990) ("an entity receives financial assistance when it receives a subsidy"); see also 42 U.S.C. 18116 (defining Federal Financial Assistance to include, specifically, subsidies); Silva v. St. Anne Catholic School, 595 F.Supp.2d 1171, 1174, 1181 (D. Kan. 2009) (parties did not dispute that a private, parochial school received federal financial assistance because it participated in the NSLP); see doc. no. 19 at p. 17 and doc. no. 25 at pp. 6-7 (Diocesan briefs acknowledging that participants in the NSLP are subject to Title IX and the Rehabilitation Act). As such, there is no dispute

that Geibel is subject to the requirements of Title IX and the Rehabilitation Act. 20 U.S.C. §§ 1681, 1687(2)(B); 29 U.S.C. §§ 794(a), 794(b)(2)(b).

Both Title IX, and the Rehabilitation Act provide that no person shall be "subjected to discrimination [on the basis of gender or disability] under any program or activity receiving Federal financial assistance". 20 U.S.C. § 1681(a); 29 U.S.C. § 794(a). Before passage of the Civil Rights Restoration Act, the United States Supreme Court held that this anti-discrimination language was "program-specific." Grove City College v. Bell, 465 U.S. 555, 570-71 (1984); Consolidated Rail Corp. v. Darrone, 465 U.S. 624, 635-36 (1984). In other words, the prohibition on discrimination applied only to an institution's operation of the particular program that received federal funds. However, the Civil Rights Restoration Act broadened the definition of "program or activity" so that the anti-discrimination provisions of both statutes would apply "institution-wide." 20 U.S.C. § 1687; 29 U.S.C. § 794(b). In other words, the prohibition on discrimination applied to the entire institution and all of its operations, programs, and activities whenever it received any federal funds at all.

Therefore, it follows that because Giebel receives Federal Financial Assistance by obtaining subsidies through the NSLP, Geibel is subjected to the anti-discrimination requirements

of Title IX and the Rehabilitation Act in all of its operations. Russo argues that because Geibel[3] is subject to the anti-discrimination requirements of Title IX and the Rehabilitation Act, the Diocese and GCCHS are also subject to them. However, the Diocese and GCCHS contend that because the National School Lunch Act speaks to individual schools, or attendance units, and "not groups of school [sic] or a school system," participation by one school in the program "cannot by extension bind either the Diocese as a whole or GCC[HS]" [doc. no. 19 at pp. 16, 17].

In support of their position, the Diocese and GCCHS point out that the application materials, contracts, and reports required by the NSLP are specific to individual school buildings, and do not apply to entire school systems. In other words, an elementary school could decide to participate in the NSLP but the high school in that same school system could decide not to participate. We do not, nor could we, dispute the accuracy of the Diocese or GCCHS's summary of the NSLA, or its program materials.

However, although accurate, the summary misses the mark. In determining whether the Diocese and GCCHS are recipients of Federal Financial Assistance because Geibel participates in the NSLP, we must review and apply the language of Title IX and the

---

[3] The court recognizes that several elementary schools within the Diocese also participate in the NSLP. Because Geibel's participation in the program is dispositive under the facts of this case, we need not also consider the facts surrounding the elementary schools' participation.

Rehabilitation Act, not examine the NSLA and how the NSLP operates. Both Title IX and the Rehabilitation Act define "program or activity" in the context of non-public educational institutions to mean "all the operations of...a[n] other school system." 20 U.S.C. § 1687(2)(B); 29 U.S.C. § 794(b)(2)(b). In order to decide whether Geibel's participation in the NSLP subjects GCCHS, and the Diocese, to the institution-wide, anti-discrimination requirements of Title IX and the Rehabilitation Act, we must determine what the "other school system" is in this case.

The Court of Appeals for the Third Circuit has recently provided guidance in undertaking this task in <u>Haybarger v. Lawrence County Adult Probation and Parole</u>, 551 F.3d 193 (3d Cir. 2008). Although the appellate court did so in the context of assessing the scope of a waiver of Eleventh Amendment immunity of a governmental agency or department under the Rehabilitation Act, the appellate court's analysis is nonetheless directly applicable here. In <u>Haybarger</u>, the Domestic Relations Section (DRS) of the Fifty-Third Judicial District of Pennsylvania, which was not a defendant in the case, received federal funds to assist with child support enforcement. <u>Haybarger</u>, 551 F.3d at 199-201. The Lawrence County Adult Probation and Parole Department (LCAPPD), a named defendant in the case, which, like the DRS, was also a sub-unit of the Fifty-Third Judicial District, did not receive any federal funds. <u>Id</u>.

11

The question presented was whether the DRS's acceptance of federal funds resulted in a waiver not only of its own immunity from suit, but also the entire Judicial District's, which would include, by extension, the LCAPPD's immunity. To answer this question, the court of appeals asked what the relevant "program or activity" was under section 794(b). Section 794 defines "program or activity" in the context of governmental agencies to mean "all the operations of...a department, [or] agency...of a State or of a local government..any part of which is extended Federal financial assistance." Id. at 199.

Applying this definition, the appellate court asked whether the DRS was an independent agency with a legal status of its own, in which case its acceptance of federal funds waived only its own immunity; or, was instead merely a part of, or subunit of, the Fifty-Third Judicial District, in which case the DRS's acceptance of federal funds would apply to the entire Judicial District and all of the DRS's fellow subunits, including defendant LCAPPD. Id. at 200. The court looked to state law in making this determination and concluded that the DRS was a subunit of the Fifty-Third Judicial District and not an independent legal entity. Id. at 201-02. As a result, the Fifty-Third Judicial District became the relevant governmental agency for purposes of section 794(b). DRS's federal funding, and accompanying waiver of immunity, was imputed up the organizational chart, to the Judicial

District, and across the organizational chart to all of the District's other subunits. Therefore, the LCAPPD became amenable to suit under the Rehabilitation Act. Id.

Notably, the court of appeals did not consider the language of the Social Security Act, under which the DRS received the federal funds for child support enforcement, how applications to participate in that federal program were structured or submitted, the reporting requirements under that federal program, the actual interaction between the DRS and LCAPP, in general, or as to the federal funds at issue, or the effect that the DRS's federal funding had on LCAPP. Instead, the court sought only to determine the legal status of the DRS under Pennsylvania law in order to decide what the operative governmental agency was for the purpose of applying the Rehabilitation Act's definition of "program or activity." Finding the DRS to be a subunit of the Judicial District, which was the operative government agency, it imputed the DRS's receipt of federal funds to its fellow subunit, LCAPP.

In applying the court of appeals's analysis to this case, we must determine Geibel's legal status under state law in order to decide what the operative "other school system" is for purposes of Title IX and the Rehabilitation Act's definition of "program or activity." 20 U.S.C. § 1687(2)(B); 29 U.S.C. § 794(b)(2)(b). If Geibel has the legal status of being its own, independent "other school system", then its participation in the NSLP would have no

13

effect on the Diocese or GCCHS. If it does not have such a legal status, then the Diocese must be the operative "other school system" for purposes of Title IX and the Rehabilitation Act. In that case, Geibel's receipt of Federal Financial Assistance is imputed up the organizational chart to the Diocese, and across the organizational chart to its fellow Diocesan high school, GCCHS.

Determining the legal status of Geibel is an easy task in this case because the Diocese and GCCHS have consistently represented to this court that neither of these Diocesan high schools are separate legal entities [doc. no. 10 at p. 7; doc. no. 19 at p. 23-24; doc. no. 25 at p. 6]. Although the Diocese and GCCHS contend that this has no bearing on whether the Diocese or GCCHS receive Federal Financial Assistance, they are wrong. Instead, under Haybarger, Geibel's legal status is dispositive. Because Geibel has no legal status separate from the Diocese, the Diocese is the operative "other school system" under Title IX and the Rehabilitation Act. As such, Geibel's receipt of Federal Financial Assistance, in the form of NSLP subsidies, is imputed to both the Diocese and GCCHS.

Therefore, both the Diocese and GCCHS receive Federal Financial Assistance and are amenable to suit under Title IX and the Rehabilitation Act. This court has subject matter jurisdiction over Russo's federal claims and will exercise supplemental jurisdiction over her state claims.

B.  <u>E-rate Program Participation</u>

Russo also contends that the Diocese and GCCHS received Federal Financial Assistance by participating in the E-rate program. Even though we have found that the federal NSLP subsidies received by Geibel are Federal Financial Assistance to the Diocese and GCCHS, we will address this alternative argument as well in the interest of completeness.

The Diocese and GCCHS admit that they participate in the E-rate program. However, they dispute that the E-rate program is a form of Federal Financial Assistance. Instead, according to the Diocese and GCCHS, the program does no more than force private telecommunications vendors to sell their services to schools at a discount. In contrast, Russo contends that the E-rate program is a federal subsidy and, as such, qualifies as Federal Financial Assistance. We find that the Diocese and GCCHS's participation in the E-rate program makes them recipients of Federal Financial Assistance.

The E-rate program was created under the Telecommunications Act of 1996. Pub. Law 104-104, 110 Stat. 56, 47 U.S.C. 254(h)(1)(B). Its purpose was to promote universal access to the Internet, and other technologies, especially in schools and libraries. The United States Supreme Court has characterized this program as a form of "federal assistance" intended to help the public gain access to the Internet. <u>United States v. American</u>

Library Association, Inc., 539 U.S. 194, 199 (2003).  In that case, the Court considered a First Amendment challenge to the Children's Internet Protection Act, which was enacted out of Congress's concern that "the E-rate and LSTA[4] programs were facilitating access to illegal and harmful pornography."  Id. at 200.

The Senate Report accompanying CIPA refers to E-rate as a program of "federal universal service assistance," which is administered in the "form of a subsidy undertaken as part of the spending power of Congress."  S. Rep. 105-226, 1998 WL 413894 at *3.  The report describes CIPA as an exercise of Congress's power "to see that federal funds are appropriately used" and as providing "clear notice of the conditions placed on the acceptance of the federal funds."  Id. at *3-4.  Accordingly, both the United States Supreme Court, and the United States Senate, have characterized the E-rate program as federal funding, in the form of a subsidy.[5]

We find nothing in this record that would constrain us to disagree.  For example, the instructions accompanying FCC Form 471,

---

[4] Under the Library Services and Technology Act, grants are made, through the Institute of Museum and Library Services, to state library administrative agencies to electronically link libraries with educational, social, or information services.

[5] The district court in the American Library Association case also recognized that the E-rate program provided federal funds to its participants.  Having found CIPA to be facially unconstitutional, the district court permanently enjoined the Federal Communications Commission from "withholding federal [E-rate] funds from any public library for failure to comply with [CIPA]".  American Library Association, Inc. v. United States, 201 F.Supp.2d 401, 496 (E.D. Pa. 2002).

16

through which E-rate discounts are obtained, indicate that the E-rate program is administered by the Federal Communications Commission pursuant to federal law, and notify the applicant that information disclosed on Form 471 could be used as a basis for collecting a past due debt to the Federal government, or revealed to the public in response to a Freedom of Information Act request. [doc. no. 20-5 at p. 44]. No reasonable juror could find that the E-rate program does no more than force private vendors to offer discounts to schools and libraries, as the Diocese and GCCHS assert. Instead, both the Diocese and GCCHS received subsidies through the E-rate program, making them recipients of Federal Financial Assistance.

Regardless, in this case there is no dispute that the Diocese and GCCHS did more than simply seek discounts through the E-rate program. Rather, they affirmatively applied for a grant funded by both state funds and matching federal E-rate dollars, to establish a fiber optic network to connect ten consortium member schools within the Westmoreland Intermediate Unit, including GCCHS. [doc. no. 20-3 at p. 27; doc. no. 23-2 at p. 29]. Based on this evidence, no reasonable juror could find that the Diocese and GCCHS received nothing more than discounts from their private vendors through the E-rate program. Instead, both the Diocese and GCCHS received an E-rate grant, making them recipients of Federal Financial Assistance.

Therefore, both the Diocese and GCCHS receive Federal Financial Assistance and are amenable to suit under Title IX and the Rehabilitation Act. This court has subject matter jurisdiction over Russo's federal claims and will exercise supplemental jurisdiction over her state claims.

IV. <u>CONCLUSION</u>

The court finds as a matter of law that the Diocese and GCCHS are recipients of Federal Financial Assistance based on their participation in the National School Lunch program and the E-rate program. Both defendants are amendable to suit under Title IX and the Rehabilitation Act. An appropriate order follows.

We address the issues raised in defendants' motion to dismiss [doc. no. 8] in a separate opinion, filed contemporaneously.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CAITLIN RUSSO,                       )
                                     )
        Plaintiff,                   )
                                     )
    v.                               )   Civil Action No. 09-1169
                                     )
DIOCESE OF GREENSBURG and,           )
  GREENSBURG CENTRAL CATHOLIC        )
  HIGH SCHOOL,                       )
        Defendants.                  )

## ORDER

AND NOW, this 15th day of September, 2010, IT IS HEREBY ORDERED that defendants' motion for partial summary judgment [doc. no. 18] is DENIED. IT IS FURTHER ORDERED THAT judgment as a matter of law is entered that defendant Diocese of Greensburg and defendant Greensburg Central Catholic High School are recipients of Federal Financial Assistance;

IT IS FURTHER ORDERED that the stay entered in this case on December 22, 2009 is HEREBY LIFTED. An order ruling on defendants' motion to dismiss [doc. no. 8] will be filed contemporaneously with this order.

THE COURT FURTHER FINDS that this order involves a controlling question of law as to which there is substantial ground for difference of opinion and an immediate appeal from this order may materially advance the ultimate termination of the litigation. Should any party apply to the Court of Appeals for the Third

Circuit for permission to appeal from this order, all proceedings in this court shall be immediately stayed pending resolution of that application, and if applicable, the attendant appeal.

BY THE COURT,

_____, C.J.

cc: All Counsel of Record